AO 91 (Rev. 5/85) Criminal Complaint      S. A. J. Shoup, FBI 237-4191      AUSA C. Oberg (313) 226-9701

NWI      12

# United States District Court

| **EASTERN** | **DISTRICT OF** | **MICHIGAN** |

| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |

v.

*NEMR ALI RAHAL*

CASE NUMBER:

## 05-80389

(Name and Address of Defendant)

I, _John Robert Shoup_, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. From on or about _January 2000 through the present_, in _Wayne_____county, in the Eastern District of Michigan, defendant(s) did *(Track Statutory Language of Offense)*

knowingly and with the intent to defraud, obtained money in the custody and control of federally insured financial institutions by means of false and fraudulent pretenses, representations and promises; and did knowingly and with the intent to defraud used unauthorized access devices, and obtained things of value totaling over $1,000 during a one-year period,

in violation of Title __18_____United States Code, Section(s)__1344, 1029 and 2_____.
I further state that I am a(n)_ Special Agent,_____,and that this complaint is based on the following facts:

*See Attached Affidavit Hereby Incorporated by Reference.*

Continued on the attached sheet and made a part hereof:      ☒ Yes ☐ No

APR 2 0 2005

CLERK'S OFFICE
DETROIT

_____
Signature of Complainant
Special Agent John Robert Shoup, FBI

Sworn to before me and subscribed in my presence,

April 20, 2005_____      at      Detroit, Michigan_____
Date                                                    City and State

Honorable Steven D. Pepe, U.S. Magistrate Judge      _____
Name & Title of Judicial Officer                      Signature of Judicial Officer

## AFFIDAVIT

John Robert Shoup, being duly sworn, deposes and states:

1.        I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Bureau's Detroit Division.  I have been a Special Agent with the FBI for approximately fourteen years.  The facts set forth below are based upon information I have obtained from witnesses, documents and other law enforcement personnel.  I have not set out all the information I have learned relating to this investigation, but only that information necessary to show probable cause that **NEMR ALI RAHAL** has committed the crimes of aiding and abetting bank fraud and credit fraud, in violation of 18 U.S.C. §§ 1344, 1029 and 2.

### "Bust Out" Credit Fraud:  Defined

2.        Over the past few years, I have been involved in a number of investigations of subjects who were intentionally "busting out" their credit through the use of fraudulent payments. Typically, the subjects establish credit and obtain many credit cards, sometimes 50 or more, in their true names.  They may use the cards legitimately for some time, making regular payments on their accounts until they are ready to bust them out.  Then, in a very short period of time, the subjects inflate the available credit on their accounts by making a series of large payments using checks drawn on closed bank accounts, convenience checks from their other credit card accounts, or electronic payments using non-existent bank accounts.  Immediately after the bogus payments have been made and before the banks and credit companies realize they have been defrauded, the subjects obtain cash advances at casinos or banks, or purchase expensive items such as watches, jewelry, perfumes and merchant gift cards that can be easily re-sold, up to the inflated credit balance.

3.        As the final step in a typical bust out credit scheme, the subjects either flee the United States and return to their homeland, or they declare bankruptcy and wipe out their debt.  Attempts by the banks and credit card companies to collect payment on the balances due are therefore unsuccessful.

### Probable Cause that NEMR ALI RAHAL
### Is Engaged in Credit Fraud and Bank Fraud

4.        My investigation of **NEMR ALI RAHAL** has uncovered evidence he has been involved in several schemes to obtain money by fraud, including bust out credit fraud (18 U.S.C. § 1029) and mortgage / bank fraud (18 U.S.C. § 1344), as described below.

    a.        In his first scheme, **NEMR ALI RAHAL** purchased a residence located at 7515 Freda Street in Dearborn, Michigan in early 2000.  **RAHAL** made false statements and

1

submitted false documents with the bank loan application used to qualify him for a mortgage loan from Chase Manhattan Bank.

b.        In the second scheme, **RAHAL** obtained in excess of **$300,000** from his various creditors by intentionally busting out his own credit. **RAHAL** obtained numerous credit cards under his true name. Beginning in early January of 2003, **RAHAL** began to inflate the credit available on the accounts in a very short period of time by making successive payments on a number of his credit accounts, all with electronic "pay-by-phone" checks drawn on several of his bank accounts. Within a day or two of making the bogus payments and before the checks were dishonored by the banks, **RAHAL** charged up to the inflated credit balances on his accounts. On some of his merchant credit card accounts (such as Home Depot), **RAHAL** used the inflated cards to purchase large quantities of gift cards.

i.        As stated above, I know from my prior experience investigating credit card bust out schemes that gift cards are routinely purchased by subjects involved in this type of fraudulent activity because they are easily resold for cash.

ii.        **RAHAL** used the inflated credit on most of his VISA and/or MasterCard accounts to obtain cash advances at casinos and banks.

iii.        After the "phone payment" checks were returned as "account closed" or "insufficient funds" checks, **RAHAL** made no subsequent payments to his credit accounts; all his accounts were eventually charged off as bad debt by his creditors.

5.        **RAHAL**'s personal credit has been ruined and no banks or credit card companies will issue credit to him. However, rather then leave the country or file bankruptcy, **RAHAL** has begun to use the credit identity of his wife, **RANIA FAWAZ**, both to qualify for a new mortgage loan and to obtain credit cards with **RAHAL** added as an authorized user. Additional false statements have been made to various creditors concerning **RANIA FAWAZ**'s employment and income qualifications, in a continuing effort to further this ongoing credit fraud scheme.

6.        In June of 2004, I obtained a credit report for **NEMR ALI RAHAL**, social security account number 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. A review of this credit report revealed **RAHAL** had in excess of **30 revolving credit accounts, with past due balances totaling in excess of $300,000.** Also, several different spellings of **RAHAL**'s name were listed on his report, and several additional social security card numbers were attributed to him. I know from my experience investigating white collar crime matters that this can be an indication that the subject may have obtained credit under a false or altered name and/or by using a false social security number.

7.        I subsequently obtained the detailed credit account records for most of the past due credit accounts listed on **NEMR ALI RAHAL**'s credit report. According to these records, **RAHAL** had greatly inflated his annual income on some of the applications he had submitted to obtain

2

these credit cards. Also, on a majority of his credit accounts, **RAHAL** had been drawing significant cash advances through the use of convenience checks on a somewhat regular basis, beginning as early as 2001. Until January 2003, **RAHAL** made regular payments to these accounts. After January 2003, **RAHAL**'s accounts show the following pattern of fraudulent activity:

a.     **Bank of America VISA Account 4356 3100 0820 1373:**

    i.     On January 9, 2003, a $5,300 pay-by-phone payment was made.

    ii.     On January 10, 2003, a $3,500 pay-by-phone payment was made.

    iii.     On January 10, 2003, a $47.80 payment for AOL Online Service was made with this account.

    iv.     Also on January 10, 2003, a cash advance of $4,512.99 was obtained from the MGM Grand Casino in Detroit.

    v.     On January 22, 2003, both of the pay-by-phone payments were dishonored, leaving a **balance due and owing on the credit account of $14,199.63.** No payments of any kind were made to the account following this activity. Eventually the unpaid balance was charged off as bad debt by Bank of America.

    vi.     Nanette Chavez of Bank of America's consumer credit card division provided additional information to me concerning the "pay-by-phone" payments noted above. Specifically, Chavez advised the phone payments made on January 9th and 10th, 2003, were "sourced" out of Comerica Bank account 6817-06546-6. These payments were done through Bank of America's (BA's) automated pay-by-phone system. Chavez explained that to use system, the account holder must call BA's customer service center and identify himself by keying in the account number and his personal data (including social security number, etc.). Then, the caller must key in the bank account number, routing number and payment amount from which the payment is to be drawn. Once this information has been entered, BA automatically generates a check to be drawn against the account holder's bank account for use as payment to his credit account.

b.     **Household Bank MasterCard 5437 0306 8352 0562:**

    i.     This account was actually opened under the name of "NEMR A AHAL" [sic].

    ii.     On January 9, 2003, a $4,900 pay-by-phone payment was made.

      iii.       On January 10, 2003, a $4,300 cash advance was obtained from Bank One on Woodward Avenue in Detroit.

      iv.       On January 13, 2003, a $402 cash advance was obtained from a Bank One branch in Dearborn, Michigan.

      v.       On January 16, 2003, the $4,900.00 pay-by-phone payment was returned NSF, bringing the past due balance to the account of $15, 509.44.

      vi.       No further payments of any kind were made, and in September 2003 Household Bank charged off the account with a **past due balance owing of $18,198.87.**

c.      **MBNA VISA account 4313 0207 7800 7239:**

      i.       On January 4, 2003, a $9,292.49 pay-by-phone payment was made to the account from Comerica Bank account 6817-06546-6, the same account that was used to make the Household Bank payments denoted above.

      ii.       On January 5, 2003, a  $8,220 cash advance was obtained from the MGM Grand Casino in Detroit, Michigan.

      iii.       On January 8, 2003, the $9,292.49 payment was returned to MBNA as dishonored, leaving an unpaid balance on the account of $54,927.39.

      iv.       No further payments of any kind were ever made to this account and the **balance of $58,945.08 was charged off** by MBNA on June 30, 2003.

d.      **Chase Manhattan VISA account 4305 8703 6958 0519:**

      i.       On January 3, 2003, a $4,000 pay-by-phone payment was made to the account, drawn on Huntington National Bank account 2383-167480-0.

      ii.       On January 4, 2003, a $3,612.99 cash advance was obtained from the MGM Grand Casino in Detroit, Michigan.

      iii.       On January 14, 2003, the $4,000.00 payment was returned as dishonored, leaving a **balance owing on the account of $15,024.27.**

e.   **Chase Manhattan MasterCard account 5323 5034 9926 8425:**

   i.      On January 3, 2003, a $6,000 pay-by-phone payment was made to the account.

   ii.     On January 4, 2003, a $3,112.99 "Gamecash" cash advance was charged to the account.

   iii.    On January 14, 2004, the $6,000 payment was returned dishonored, leaving an **unpaid balance of $9,903.06.** No further payments were made to the account.

f.   **Chase Manhattan MasterCard account 5369 9339 3905 8158:**

   i.      On January 3, 2003, a $3,400 pay-by-phone payment was made to the account. Although this payment appeared to have been debited back to the account immediately, the subsequent returned payment fee was not charged to the account until January 9, 2003.

   ii.     On January 4, 2003, a $3,212.99 "Gamecash" cash advance was successfully charged to the account.

g.   **Chase Manhattan MasterCard account 5184 4500 6067 9341:**

   i.      On January 3, 2003, a $7,000 pay-by-phone payment was made.

   ii.     On January 4, 2003, a $6,267.75 "Gamecash" cash advance was charged to the account.

   iii.    On  January 14, 2003, the $7,000 payment was returned to the bank as dishonored.

h.   **Home Depot account CG7F91202132105:**

   i.      On November 12, 2002, this account had a balance owing of $35.05.

   ii.     On November 23, 2002, $2,450 in gift card purchases were made with this account.

   iii.    On January 16, 2003, a $2,100 payment was credited to the account.

   iv.     On January 17, 2003, $2,000 in additional gift card purchases were made to the account.

5

       v.            On January 30, 2003, the $2,100.00 payment was returned to Home Depot as unpaid.

       vi.           The account was eventually charged off as bad debt on July 31, 2003.

8.       I have obtained the bank records for Comerica Bank account 6817-06546-6 and Huntington National Bank account 2383-167480-0, the accounts identified above which were used to make the pay-by-phone payments to **NEMR RAHAL'S** credit card accounts. My review of the records revealed the following:

a.      **Comerica Bank account 6817-06546-6** was an individual account opened in **NEMR A RAHAL**'s own name.

       i.            The balance in the account on December 20, 2002 was $5.76.

       ii.           On January 9, 2003, a check in the amount of $16,500 was deposited into the account. This check was drawn on a personal account of Imad Charara.

       iii.         On January 13, 2003, the $16,500 check was returned unpaid.

       iv.         The account was closed on January 31, 2003.

b.      **Huntington National Bank account 2383-167480-0** was a joint account between **NEMR A RAHAL** and Ali Safieddine.

       i.            The beginning account balance was $1,064.42 on December 7, 2002.

       ii.           On January 3, 2003, a deposit of $23,100, consisting of three $7,700 checks drawn on the account of Dearborn Furniture Inc., was made to the account.

       iii.         On January 6, 2003, a single check of $16,500 drawn on the Dearborn Furniture, Inc. account was deposited into the account.

       iv.         On January 8, 2003, all three of the $7,700 checks deposited on January 3, 2003 were returned to the bank as unpaid.

       v.            On January 9, 2003, the $16,500 check deposited on January 6, 2003 was returned to the bank unpaid.

       vi.           On January 31, 2003, the account was closed.

6

9.         Public database records indicate that Imad Charara is listed with the State of Michigan as being the Registered Agent for Dearborn Furniture, Inc. Imad Charara is the person who wrote the NSF personal check that was deposited into **RAHAL'S** Comerica Bank account, and NSF Dearborn Furniture checks were deposited into the Huntington Bank account. The deposits of these NSF checks temporarily inflated the balances in **RAHAL's** two bank accounts that were used during the time the pay-by-phone payments were being made to his credit card accounts.

10.        During an attempt to identify additional bank accounts for **NEMR ALI RAHAL,** I learned that a new bank account was opened by **RAHAL** on January 7, 2003, at **Standard Federal Bank**. This account was opened as a joint account between **NEMR ALI RAHAL** and his wife, RANIA M. FAWAZ.   A review of the records for this account during the time of January 2003 through June 2004 revealed the following:

a.        The monthly deposits to this account averaged $4,000, mostly in the form of cash.

b.        Regular checks were also being written against the account, averaging approximately $4,000, roughly equal to the amount of deposits each month.

c.        Most of the checks were made payable to various credit card companies for significant amounts.  However, all of these payments were being made to credit accounts belonging to RANIA M. FAWAZ, not to any of the past due credit accounts of **NEMR ALI RAHAL.**

11.        I also obtained a credit report for **RANIA FAWAZ**  that was run on September 3, 2004. The report revealed very minimal activity.  FAWAZ had a total of twelve open credit accounts. Of these, eight were opened in 2002, less than six months before **NEMR RAHAL** actually began to bust out his own credit in early January 2003.

12.        My review of RANIA FAWAZ's credit accounts through June 2004 verified that while she added **NEMR RAHAL** as an authorized user on her credit accounts, it does not appear that she was attempting to bust out her accounts by making any unusual charges or apparent efforts to fraudulently inflate the credit limits.

a.        Records of Citibank credit account 5466 1600 0160 7561 indicate that in 2003 and 2004, **RANIA FAWAZ** was making regular "Click to Pay" payments on the account. I have verified with Citibank that Click to Pay payments are made from a computer, over the internet.

b.        I know from conducting fraud investigations that computers are routinely used to access credit accounts on line, to keep track of the available credit balances, to know when payments have been posted to credit accounts, to make electronic payments on credit accounts in furtherance of the fraud schemes, and generally to keep records of the

7

ongoing fraud. Additionally, I know that computers are often used to store the user's address book.

13.   I also learned of a second bank account that was opened up by Mrs. **RANIA M. FAWAZ** at **Bank One** on April 8, 2004. This account was opened as an individual account and **RANIA M. FAWAZ** was the sole signature authority on the account. The following activity was noted from a review of the detailed records for this account.

a.   The account was opened on April 8, 2004 with an opening deposit of $28,000.

b.   On April 19, 2004, $16,735.24 was withdrawn from the account. A cashier's check was subsequently obtained by FAWAZ in the amount of $16,753.24. This check, made payable to FAWAZ, was subsequently endorsed over to American Title Professional Inc.

c.   I subsequently determined that RANIA M. FAWAZ had applied for a mortgage to purchase a residence at 5479 Argyle Street in Dearborn, Michigan on or about April 15, 2004 from Shore Mortgage. A review of her mortgage application revealed FAWAZ claimed she was the General Manager at the Al Salam Supermarket located at 10394 West Warren Avenue in Dearborn, Michigan, that she had worked there for the past three years, and her current monthly salary was $3,540 ($42,480 annually).

14.   During my investigation of **NEMR A RAHAL**, I obtained copies of his Federal Income Tax returns for the tax years 1998 through 2003, which had been filed with the Internal Revenue Service. A review of these tax returns and other records revealed the following:

a.   <u>Tax year 1998</u>:   **NEMR A RAHAL** of 3901 Ebony Ave., McAllen, Texas, filed as a single person. He claimed gross income totaling **$9,032** derived from the operation of a wholesale clothing business. On a MasterCard credit card application from Fleet Bank which **RAHAL** submitted on May 15, 1998, **RAHAL** listed his annual income as being **$75,000 to $85,000.**

b.   <u>Tax year 1999</u>:   **NEMR A RAHAL** filed as a single person living at P.O. Box 6816, McAllen, Texas. **RAHAL** claimed gross income totaling **$31,849**, $31,506 of which was profit derived from the operation of a wholesale clothing business.

c.   <u>Tax Year 2000</u>:   **NEMER A RAHAL** [sic] filed a joint return with **RANIA M. RAHAL**, 7515 Freda Street in Dearborn, Michigan. He claimed gross income of **$9,660**; $12,000 of that was listed as "non-employee compensation" from Hossein Lahaji, M.D. of Weslaco, Texas, and $660 as interest income. **RAHAL** offset a <$3,000> capital loss against this income, derived from the sale of approximately $200,000 worth of stock he acquired during the year 2000. A review of **RAHAL**'s various credit account records

8

revealed he was regularly drawing large amounts of cash advances from his various credit accounts during the time frame that he was apparently acquiring this stock.

d. <u>Tax year 2001</u>:     **NEMR RAHAL** filed a joint return with RANIA RAHAL, where he claimed gross income of **$7,014**, of which $6,930 was in the form of wages payable to **NEMR RAHAL** from the WL Minimart, Inc..

e. <u>Tax year 2002</u>:     **NEMR A RAHAL** filed a joint return with RANIA M. RAHAL, 7515 Freda Street in Dearborn, Michigan. They claimed gross income of **$12,440**, including wages for **NEMR RAHAL** of $8,700 from the WL Minimart located at 6011 Livernois in Detroit, and $2,520 from the Al Salam Supermarket located at 10394 Warren Ave. in Dearborn, Michigan. In addition to **NEMR RAHAL'S** wages, RANIA RAHAL claimed wages from the Al Salam Supermarket of $1,200.

    i.       On a Shell Citibank credit card application RANIA FAWAZ submitted on August 28, 2002, FAWAZ listed her gross annual income as **$49,000**. On this application, FAWAZ also requested that an additional card be issued for **NEMR RAHAL**.

    ii.       On a Chase Manhattan application for a Platinum MasterCard date August 12, 2002, RANIA FAWAZ indicated she was employed at WL Minimart, and the household income for the year was **$99,000**.

f. <u>Tax Year 2003</u>:     **NEMR RAHAL** filed a joint return with RANIA FAWAZ *(note the name change on this return)*. Gross income claimed on this return consisted of **$6,240** in wages for **NEMR RAHAL** from the Al Salam market, and **$7,800** in wages for **RANIA FAWAZ** from the Al Salam market.

15.      I obtained the mortgage loan records of Chase Manhattan Bank for 7515 Freda Street in Dearborn, Michigan, the property that had been owned by **NEMR RAHAL**. On the mortgage application submitted to Chase Manhattan Bank to obtain this loan on February 25, 2000, **NEMR RAHAL** had listed his present home address as 6001 Coleman Street in Dearborn, Michigan, and claimed he had been residing at that address for the past 2.5 years. **RAHAL** also listed his current employer as MSI Petro Mart, Inc., 26016 John R., Madison Heights, Michigan and his position as Manager. **RAHAL** further claimed he had worked at this business for the past four years. Included with this mortgage application were copies of two W-2 statements from MSI Petro Mart for the tax years 1998 and 1999. The taxable wage amounts listed on these W-2s for **RAHAL** were **$34,462 for 1998**, and **$34,935.77 for 1999**. A gift letter was also included with this loan application indicating a $5,000 gift had been given to **RAHAL** from his father, Ali Rahal, who was also supposedly residing at the same address of 6001 Coleman Street in Dearborn, Michigan. This loan application was signed "Nemr Rahal by Ihab Kain, his attorney in fact."

9

16.     I obtained the Comerica bank account records of the Al Salam Supermarket through my investigation of **RAHAL**. These records revealed that Comerica bank account number 1851-54770-1 was opened for the Al Salam Supermarket #1 on July 24, 2002. Ihab Ali Kain was listed at the President on the signature card for the account, and **NEMR ALI RAHAL** was listed as the Office Manager. The articles of incorporation for the Al Salam Supermarket were also included with these bank records. A review of these articles of incorporation revealed Ihab ali Kain is listed as the registered agent for the corporation; his residence address is listed as 6001 Coleman in Dearborn, Michigan. A limited review of some of the detailed records for this account revealed that in January, 2003, **RAHAL** wrote several checks payable to himself, in the amount of $5,000 each, on the 15th and the 30th of each month. No additional payroll checks were noted from a review of this account activity, thus it appears as though **RAHAL** was paying himself a salary equal to $120,000 for the year 2003, even though his income tax returns for that year indicated his total income was $6,240. These $5,000 checks were not being deposited into a bank account in **RAHAL**'s own name, but rather they were being negotiated for cash by **RAHAL** at various branches of Comerica bank, apparently in an effort to conceal these funds from his creditors and from the IRS.

17.     I have verified that Chase Manhattan Bank, Standard Federal Bank, Citibank, Comerica Bank, Bank One and Huntington National Bank are all federally insured financial institutions, whose deposits are insured by the FDIC.

18.     On April 20, 2005, federal agents executed a search warrant at 5479 Argyle, Dearborn, the home of NEMR ALI RAHAL. RAHAL was advised he was not under arrest, and he was free to leave or to terminate the conversation at any time. RAHAL stated, among other things, that he is the manager of the Al Salam Market making $8.00 an hour. His wife was a part-time cashier there, making $6.00 (up to $200 a week), until she was injured in an auto accident this past year. RAHAL admitted he had "credit problems" and that he had used his credit cards to run up large charges. In particular, in January 2003, RAHAL stated he had made telephone payments to all his credit accounts, knowing he did not have the money in his bank accounts to cover these payments. RAHAL admitted he did this in order to obtain as much money as possible from his credit accounts, and that he had in fact obtained cash advances at casinos using his credit cards. RAHAL stated he hoped to use the money to gamble, and win back enough money to pay off all of his debts.

19.        In summary, I believe the information stated above does constitute probable cause that **NEMR ALI RAHAL** has committed, aided and abetted the commission of the crimes of bank fraud and credit fraud, all in violation of 18 U.S.C. §§ 1344, 1029 and 2.

JOHN ROBERT SHOUP
Special Agent, FBI


Subscribed to and sworn before me
this 20th day of April, 2005.


HONORABLE STEVEN D. PEPE
United States Magistrate Judge

11