✎ AO 472  (Rev. 12/03) Order of Detention Pending Trial

# UNITED STATES DISTRICT COURT

EASTERN    District of    MICHIGAN

UNITED STATES OF AMERICA
V.
NEMR ALI RAHAL
             *Defendant*

### ORDER OF DETENTION PENDING TRIAL

Case Number: 05-80389

In accordance with the Bail Reform Act, 18 U.S.C. § 3142(f), a detention hearing has been held.  I conclude that the following facts require the detention of the defendant pending trial in this case.

### Part I—Findings of Fact

☐ (1) The defendant is charged with an offense described in 18 U.S.C. § 3142(f)(1) and has been convicted of a   ☐ federal offense   ☐ state or local offense that would have been a federal offense if a circumstance giving rise to federal jurisdiction had existed -  that is
- ☐ a crime of violence as defined in 18 U.S.C. § 3156(a)(4).
- ☐ an offense for which the maximum sentence is life imprisonment or death.
- ☐ an offense for which a maximum term of imprisonment of ten years or more is prescribed in _____.*
- ☐ a felony that was committed after the defendant had been convicted of two or more prior federal offenses described in 18 U.S.C. § 3142(f)(1)(A)-(C), or comparable state or local offenses.

☐ (2) The offense described in finding (1) was committed while the defendant was on release pending trial for a federal, state or local offense.

☐ (3) A period of not more than five years has elapsed since the ☐ date of conviction  ☐ release of the defendant from imprisonment for the offense described in finding (1).

☐ (4) Findings Nos. (1), (2) and (3) establish a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of (an) other person(s) and the community.  I further find that the defendant has not rebutted this presumption.

### Alternative Findings (A)

☐ (1) There is probable cause to believe that the defendant has committed an offense
- ☐ for which a maximum term of imprisonment of ten years or more is prescribed in _____.
- ☐ under 18 U.S.C. § 924(c).

☐ (2) The defendant has not rebutted the presumption established by finding 1 that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community.

### Alternative Findings (B)

☑ (1) There is a serious risk that the defendant will not appear.
☐ (2) There is a serious risk that the defendant will endanger the safety of another person or the community.

See attached:  Text of reasons for the Detention of Nemer A. Rahal

### Part II—Written Statement of Reasons for Detention

I find that the credible testimony and information submitted at the hearing establishes by  ☐ clear and convincing evidence  ☑ a preponderance of the evidence  that

NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE THE APPEARANCE OF DEFENDANT AS NEEDED FOR TRIAL.

### Part III—Directions Regarding Detention

The defendant is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the United States marshal for the purpose of an appearance in connection with a court proceeding.

| 5/4/2005 | s/Steven D.Pepe |
|---|---|
| Date | *Signature of Judge* |
| | Steven D.Pepe, U.S. Magistrate Judge |
| | *Name and Title of Judge* |

*Insert as applicable:  (a) Controlled Substances Act (21 U.S.C. § 801 *et seq.*); (b) Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq.*); or (c) Section 1 of Act of Sept. 15, 1980 (21 U.S.C. § 955a).

Text of reasons for the Detention of Nemer A. Rahal:

Facts:

Defendant Nemr Ali Rahal is charged with "bust out" credit card and bank fraud. He was born in Lebanon, and came to the United States in 1985 on a student visa. Initially he resided in Texas. He married a United States citizen in 1993. He has no prior criminal record. He became a naturalized citizen in 1999. He divorced and remarried Rania Fawaz with whom he has two children, Ali and Nour. (Defendant told Pretrial that he had three children but his tax returns indicate two living with him. He may have a child in the custody of his first wife.) Defendant moved to the Detroit area in 2000 and currently lives in Dearborn at the Al Salam Market where he is apparently manager and part owner earning $1,200 per month. He reported to Pretrial Services he was unemployed for the three years after moving to Michigan in 2000, and dependent on friends for support.

The "bust out" activity with which Defendant is charged involves obtaining multiple credit cards for a period of time, and eventually making prepayments with bad checks on the account to inflate the credit limits available. After this is done and before the checks are discovered to be bad, the funds are withdraw by obtaining cash advances at banks or casinos or by purchasing items or merchant gift cards that can be resold.

At the combined detention and preliminary examination probable cause hearing, FBI Special Agent John Robert Shoup testified that in a period of about a week or so in January 2004, Defendant "busted out" over $300,000 in funds that his credit report indicates have been charged off by the financial institutions issuing the card. Agent Shoup testified that individuals who have a foreign connection commonly leave the country after such activities or declare bankruptcy. He noted that with the recent changes in the federal bankruptcy laws, the latter option for discharging such debts is less likely to succeed. Defendant indicated to Pretrial that he has no assets in his name, and the family home is in his wife's name.

Agent Shoup also noted that a rather unique feature of this case involves Defendant having his name added to several credit cards issued to his wife Rania M. Rahal, but in her maiden name of Rania Fawaz (7 such cards were introduced as exhibits). Her credit reports shows little activity on credit cards, and these accounts have not been used for any fraudulent activities, although the government is suspicious that these accounts may have been acquired to lay a basis for future "bust out" activities by Defendant.

Testimony indicated that in the 30 years Defendant has resided in the United States he has made 10 trips to Lebanon where his father and eight siblings live. He also has a brother living in Canada and one in Germany. The most recent trip was from October 10 - December 21, 2002, with a visa stamp showing a one day side trip to Syria. Last year he made two trips to Canada using a family car, and on or about February 6, 2005, he made a trip to Canada using a rented car. When returning through the Windsor-US border crossing, at secondary inspection, chemical test revealed vapor signs of high level military explosives RDX and HMX on his passport and that of his son.

Thereafter a search warrant was executed on his home on April 20, 2005, and in addition to evidence of credit card and bank fraud, several videotapes and other materials related to Hezbollah were found. The FBI obtained a second search warrant for Hezbollah related materials. A criminal complaint for credit card and bank fraud was issue that day, and defendant appeared and was temporarily detained at the request of the government.

Defense counsel stipulated to probable cause on the credit card and bank fraud claims. Notwithstanding that stipulation the government presented evidence of the "bust out" activities in order to attempt to demonstrate both risk of flight and to support its belief that Defendant has provided material support to a designated foreign terrorist organization, Hezbollah, the Lebanese Shiite Muslim group, with ties to Syria and Iran, suspected to have been involved in the suicide bombing of U.S. Embassy compounds in Lebanon and killing 270 Americans Marine and other terrorist acts is so designated by the United States.

In addition to the credit card frauds, the government presented evidence suggesting other misrepresentations made to a financial institution in order to obtain mortgage loans on two different Dearborn residences. Defendant stated to FBI agents that his wife worked as a cashier at the Al Salam Market earing $6.00/hour or about $200-$300 per weeks. Joint tax returns of Nemr and Rania Rahal (Rania Fawaz on the 2003 joint return) introduced into evidence showed $14,040 for 2003, $12,440 for 2002, $7,014 for 2001, $9,660 for 2000, and individual returns of Defendant with income $31,849 for 1999 and $9,032 for 1998.

A Uniform Residential Loan Application for a $134,400 mortgage loan by Rania Rahal, dated March 29, 2004, listed $45,000 in a Standard Federal Bank checking account and a salary for Rania Rahal of $42,480 per year from the Al Salam Supermarket. Her W-2 attached to the joint 2003 return showed a salary of $7,800 from the Al Salam Supermarket.

A Uniform Residential Loan Application for a $100,000 mortgage loan by Defendant , dated February 25, 2000, listed $49,000 gift from his father in liquid assets and another $50,000 in real estate, as well as his salary of $3,600 per month from MSI Petro Mart and annual salary for her in excess of $34,000. The application said Defendant has worked at MSI Petro Mart for four years and has attached two W-2 forms for 1998 and 1999 showing total wages of $38,842 and $ 40,827 respectively. This is substantially different from the Defendant's reported income on his IRS returns of $9,032 for 1998 and $31,849 for 1999.

Also found during the search were airline tickets for a June 13-14, 2005, flight from Detroit to Beirut, Lebanon, via Paris, for Defendant, his wife and two children with tickets for a return on August 18. The FBI agents initially seized Defendant's ticket and passport, and when they returned the next day to get the other tickets and passports, Rania Rahal refused to produce them, screamed at the agents "I don't care, take it all, I leaving anyway, I hate this country!" The February 4, 2005, receipt for the tickets shows tickets for two adults and two children were purchased for $4,864. This was two days prior to Defendant's February 6 trip to Canada.

Other records seized are handwritten notes of apparent stock sales by Defendant in 2000, and a E*TRADE Consolidated 1099 for 2000 issued to Defendant showing sales for that year of $270,956.99. There was also a July 30, 2002, agreement showing Defendant acquiring a 37% interest in a Fruit and Vegetable business. In addition there were several copies of cashier's checks drawn by Defendant on American Banks ranging from $4,500 to $8,500 made to either "Hassan Rahal,""Hassan or Ali Rahal," "Ali or Nemr Rahal" or "Nemr, Rahal or Ali Rahal" most of which were cashed in Lebanon. There was also a Beirut, Lebanon, Allied Bank savings account in the name of "ALI NIMER RAHHAL & OR NIMER ALI RAHHAL" with a December 19, 2002, balance indicted to be $21,991. Hassan Rahal is Defendant's brother in Lebanon and Ali Rahal is his father's name, also living in Lebanon (and the name of Defendant's son).

2

The search also revealed a collection can used for collecting contributions for "the orphans" and about $600 in loose change and funds. Defendant admitted collecting funds for "the orphans" and sending money overseas for that purpose. Agent Shoup testified collections of funds for "the orphans" are collections for the widows and orphans of Hezbollah martyrs.

Several photographs were introduced into evidence of pictures seized at Defendant's home and a storage unit. One showed Defendant burning a torn American flag, another with him rubbing his feet on a replica of an Israeli flag. One showed Defendant with a group and the word "Inspiration" in Arabic, another with a group, possibly including Defendant under a poster of Ayatollah Ruhollah Khomeini of Iran, another with Defendant holding a rifle to the head of another individual (possibly posed because another shows a different person holding the rifle aimed at the same person now against an automobile). There was a photo apparently of a poster showing Hezbollah's Secretary General Hassan Nasrallah holding what appears to be a Kalashnikov rifle also showing a Hezbollah green-and-yellow banner which also shows a fist brandishing a Kalashnikov rifle. Several other pictures show Defendant and other with handguns and rifles in posed positions, one with Defendant with two children in what appears to be a martial arts striking pose. Other photos show him with military equipment, likely at a US facility because one photo shows Defendant standing on the tire of a canon behind a US Marine, posing as if he were about to strike the Marine.

Videotapes and an audiotape and several books were also seized. One of the videotapes was a professional production showing Hezbollah's Hassan Nasrallah speaking, another shows Martyrs of the Resistance, including pictures of men with explosives on belts. Translated talk-over included: "I swear on the blood of our children that we will answer the call and destroy our bodies to quake the earth under the feet of our enemies – America and Israel." "The operations are not part of negotiations; the resistance is not part of negotiations. As long as there is occupation there will be resistance."

Another videotape showed Defendant and his son (apparently shot in part by his wife while they were in Lebanon because she appears in other portions of the video) showing an outdoors entry parade and rally for Mahdi Scouts, Hezbollah's youth group, showing youth groups from their teens down to what appeared to be about 6-7 year olds – in scout like uniforms marching to military music. Each age cohort group marching was named after a Resistance martyr. At the inside rally of these Mahdi Scouts, Defendant applauds the speaker and later, with his son on his shoulders, pumps his arm and fist in the air along with others in the crowd in apparent enthusiasm and support for the rally which is supporting the Muslim Resistance and martyrs against the Zionist. Agent Shoup estimated this was videotaped 2-3 years ago given the apparent age of Defendant's son compared to his present appearance. This makes it likely to have been filmed in the fall of 2002 when Defendant was in Lebanon.

Another tape was shot by an amateur showing a group exploring with delight a bombed out home of a collaborator with the Jews who was killed.

Arabic translations of portions of the exhibits and tapes included such phrases as "Inspiration", "The Martyrs of the Resistance", " Intifada," "Strike the enemy under the feet of Resistance," "You return to glory of Arabs. Resistance is victorious," "The greatest threat is Israel – a cancer that must be confronted – every Muslim [ ] to confront Zionist until the threat is removed." The written materials include a book called the Confrontation involving orders for Islamic resistance infiltrating the Iraq Baathist military, stealing weapons and handing them over to the Iranians, another publication, Unity, with a picture of the Ayatollah Khomeini and exhorting that "Jihad ("holy war') is the way to establish

3

God's justice and law on earth." There is another publication noting "America is the great Satan," with President Reagan's head on the body of a Marine with his hands behind his dead as if captured. The audiotape is also in Arabic and the speaker declares that "It is true what Khomeini said that all our problems are from America" and urging "Death to America . . . Death to America."

Defense counsel pointed out on cross examination, there is no evidence indicating defendant's possession of the Hezbollah or other anti-Israeli and anti-American materials was illegal and not protected activity for a U.S. citizen under the First Amendment. The government acknowledged that it had no direct evidence that Defendant ever transferred any funds to Hezbollah or any foreign entity designated as a terrorist organization.

Conclusion:

While there are reasonable grounds for the government to be suspicious of Defendant's involvement and apparent support for Hezbollah and its causes, including Resistance suicide killings to defeat the Israelis, the evidence presented does not establish by clear and convincing evidence (as required under 18 U.S.C. §§ 3142(e) and (f)(2)in order to detain him for danger to the community) that no combination of conditions will reasonably assure the safety of the community.

Yet, in addition to danger to the community, the Bail Reform Act is concerned about risk of flight. Defendant has strong ties to family members in Lebanon, and possibly also a brother in Canada. He has transmitted substantial funds to his relatives in Lebanon, and has recently had an account with his proceeds apparently deposited in a Beirut bank. There are substantial funds unaccounted for from the Defendant's 2002 $300,000 plus "bust out" activities, as well as the quarter of a million dollars in stock sales in 2000. Defendant has recently traveled to Canada, and he had plans for himself, his wife and two children to fly to Beirut in June. While the tickets are "round trip" there is no certainty he intended to return given the common pattern of perpetrators of "bust out" offenses who have foreign connections to leave the country. Defendant has family and possibly other connections in Lebanon who could assist him, financially and in other ways, in flight and in hiding. It appears that any ties of allegiance to the United States of Defendant and his wife have been supplanted by his attraction and commitment to Hezbollah and Lebanon, and this increases the likelihood of flight. This, plus his pattern of fraudulent activities, do little to give the Court confidence that he would honor any assurances by him not to leave the United States if released. His efforts to flee need not be in conjunction with his family who could arrange to join him later. No bond amount nor home confinement with an electronic monitor will prevent his flight. Nor has Defendant proffered any suitable third party custodian.

Accordingly, for the above stated reasons it is found by a preponderance of evidence that under 18 U.S.C. §§ 3142(e) that no condition or combination of conditions will reasonably assure the appearance of the Defendant as required for trial of this matter. Defendant shall be held in custody of the United States Marshal pending trial.

May 4, 2005                             Steven D. Pepe
                                        U.S. Magistrate Judge